You may proceed. The district court order requiring the Department of Correction to provide inmate Michelle Kosilek with sex reassignment surgery should be overturned by this court, which represents a significant departure from Eighth Amendment jurisprudence with regard to the medical care to be provided to inmates by correctional systems. For nearly 30 years, this court has held that to establish a violation of the Eighth Amendment, an inmate must show that medical care provided was so inadequate as to violate, to shock the conscience. This is held in decisions such as Silas v. Browning, Taraka v. Maloney, Georges v. Moran, Feeney v. CMS, and Lovett v. CMS. The district court's decision substantially expands the Department of Correction's obligations to medical care from providing minimally adequate care to providing ideal care. Mr. McFarland, as I struggled with your argument, it seems to me that what you're really saying is that this particular type of medical treatment, the SRS, is categorically a type of medical treatment that the state never need provide to alleviate a prisoner's suffering. Is that correct? That's not correct, Your Honor. In this case, we're focusing on... Let me stay with that for a minute, though. So if you're not saying that it categorically never need be provided, what fact findings would we need to have in the record to sustain in order to provide such medical treatment that we don't have in this record? Well, we'd have to find that the treatment being provided to the transsexual inmate was wholly inadequate and was unconscionable. And then don't we have three or perhaps four experienced, qualified medical practitioners who precisely so testified and who the district court judge, after hearing it and seeing them testify, opted to believe and fully credit their testimony and not credit the testimony of your person witness? Well, part of the problem is that that is the standard of the Eighth Amendment for care. Our position is that by providing effective care, as we did to Ms. Kosolek, by providing her with hormones, evaluated by an endocrinologist... But you have doctors who testified that that wasn't effective. But that was... And the district judge found those doctors to be more credible than the one doctor who testified to the contrary. Well, the question again is, was effective treatment? And in this case... That's right. An individual who was receiving substantial amount of care directed at gender dysphoria had spent 20 years doing very well in a medium security prison, no incident reports, working full time, attending programs, very highly functional. And the court found that the fact that Ms. Kosolek was threatening to commit suicide if denied the surgery, that created a substantial risk of harm. Though the treatment provided by the state... Severe emotional distress that could lead to suicide ideation resulting in suicide. Well, the court in this decision characterized that severe distress as being the suicidality. And in that case... But clearly the experts, Dr. Schmidt and Dr. Levine, found that... Well, there are other psychotic conditions that result in suicidal ideation. Isn't that correct? That's correct. And the Department of Corrections has extensive methods for treating inmates who are mentally ill and who are suicidal, including antidepressant medications, intensive psychotherapy, a protective environment, hospitalization. Those are all available to any mentally ill inmate who is believed to be depressed and suicidal. And that would also be available to Michelle Kosolek should she become depressed in the future and suicidal. Let me ask you this. Suppose we pretend that we're jurors or district court judges, and we believe fully in 100 percent the testimony of the three expert witnesses, including witnesses selected by the prison to examine this witness, and we disbelieve Dr. Schmidt entirely. So if we fully credit the testimony of those three witnesses that this is the only medically accepted treatment that would be sufficient to alleviate the suffering of this prisoner, then would you agree with me that that should be provided? Well, your Honor, I have a hard time believing that the presence of this court, which requires treatment that must be no longer so inadequate as to strike the conscience. But I'm asking if we... If you credit the testimony of those three witnesses that, as a medical matter, this is indeed the generally accepted, only adequate treatment to alleviate this witness's suffering, on what grounds would your client refuse to provide it? Well, they could refuse to provide it based on security and safety grounds. Okay. And that would be it, wouldn't it? Yes. If there were no other contraindications, if everyone felt that this was the only solution available. But again, there are lots of issues that have come up. And for example, the issue of where to place the housing was an issue that was raised. But I think part of the problem... On the security issues, did not the district court judge, in making his determinations of credibility, decide, in essence, that your client was lying? Well, are you talking about Commissioner Donahue? Yes. Well, he determined that she was not forthcoming with regard to certain issues about the timing of... And why they hired Ms. Osborne. And under our law, when a prison official gives false pretextual reasons for claiming a security problem, and doesn't investigate the security in a good faith manner, isn't our law clear that any deference to the prison officials on the subject of security that we would usually give quite heavily, goes out the window? Well, I don't believe that the facts... That was the entire amount of the evidence that was directed towards Commissioner Donahue. She basically determined that we would go through with the surgery, but she determined that there were such security concerns that had to be addressed. I mean, you're looking, also, at a time frame where Ms. Kosevich was determined to be... In September of 05, the evaluation was completed shortly thereafter by Fenwick Clinic. Within three months, three to four months, the Commissioner came back and said, we're aware of this timing by the experts. We have significant security concerns. Mr. McFarland, if Michelle Kosevich had committed murder ten days after her surgery, it would still be DOC's responsibility to house her somewhere. Isn't that correct? She committed it in the community, you mean? And that was sent? Yes. I mean, you would still have a transsexual in need of housing in a correctional facility. Isn't that correct? Well, the problem is that... Isn't that correct? It is correct that we would house any inmate that comes in our system, but in Ms. Kosevich's case... It's the same security concerns, isn't it? Well, no, it's not quite so, Your Honor. Michelle Kosevich is a highly infamous figure in the Department of Correction. Well, you're accustomed to dealing with notorious criminals, regardless of the reason for their incarceration. But this is a very unique situation. This is an individual who brutally murdered his wife, her wife, and was sent to prison and has spent a campaign for many, many years, which is, as we all know, has created a lot of notoriety, and that itself creates a problem. How is that climate problem any different from any other prison climate problems that you deal with? You deal with gang violence, you deal with child murderers. That creates climate problems. How is this so unique a client problem? Superintendent Bissellette testified at length at trial, and she had been the superintendent for many years at Staten Island Women's Prison, and she was very clear that she had extreme concerns about the climate issues, especially when you have a population of female offenders which are 60%, 70% victims of domestic abuse. And here was Ms. Kosevich, who has killed someone in domestic abuse, someone who is very well known, very polarizing. So Superintendent Bissellette, who knows the population very well, testified to her concerns. Are you arguing that that constitutes clear error? What is our standard of reviewing those findings? Well, we believe it's along the continuum, and that this should be given a heightened standard review of review. I mean, many of these facts are tied up into the case precedent. Based upon what case precedent is this entitled to a heightened standard of review? Even this court's decision, Batista talked about having a higher standard of review when you're looking at the deliberate indifference standard. So there's a number of cases that we cite in our brief which talk about when you have the facts totally intertwined with the constitutional law and legal issues, that you need to have a more strict and a little bit more heightened review, and not just a carte blanche clear error standard. Now, thank you. Are you referring to the Ninth and Fifth Circuit cases? Yes, Your Honor. So there are cases that do. Even this circuit has been somewhat unclear about where the continuum, when you have a mixture of facts and law intertwined, how that is determined and how plenary should that review be. But clearly- Well, where on the continuum should the judge's finding that the reasons asserted by the DOC were pretextual? Where on the continuum should that review be? I would say it would be more towards the legal end of the continuum, because you have a situation where the Supreme Court- But isn't intent generally a factual finding for the jury or the fact finder? It generally is. But I think in this situation, you've got a legal finding that the actions and behaviors of the Commissioners of Correction, there must be substantial evidence that they were acting inappropriately or reached the level of criminal recklessness in their behaviors. And I think that requires somewhat of a more strict, a more heightened review than just a clear error. I'm interested in your explanation on security issues. I understand it in response to Judge Thompson's question. If you had a post-surgical transgender patient who committed the crime tomorrow and was tendered over to your care for custody, you could house and handle that person. But you can't, Ms. Kozlik, because she has become, in your words, notorious by successfully pursuing her rights under the United States Constitution in the face of what the court found to be a bad faith response by your client. Hence, she loses? Is that the logic you're tendering? The logic we're dealing with is a prison environment. And we had testimony from the superintendent, who understands prisons and prisoners, and how these things can affect the climate. But how do you differentiate Kozlik from the prisoner who could show up on your doorstep tomorrow? Well, that prisoner probably would not be, I mean, total speculation is what that prisoner's background is. A murderer who's post-surgical. I guess without any knowledge of her transition, there may not be an issue. That's not the case here. The only difference you're now directing us to is that Kozlik asserted federal constitutional rights and was, according to the circuit, once already sustained on an appeal against your client. And because of that, she's out of luck. Well, there are other issues that were raised by it. But one of the primary issues was post-housing for Ms. Kozlik. And the superintendent felt, at MCF Birmingham, that it would create all kinds of problems and would be forced to place Ms. Kozlik in a 23-hour-a-day lockup in order to protect her from other inmates who may have a vendetta against her for whatever reason. Counsel, may I follow up with just a couple of questions? Does the Corrections Department have any post-SRS inmates in the system at this point? Not that I'm aware of, Your Honor. Do you know whether it has had any in the past? I'm not sure that I've been aware of the facts at my hand, Your Honor. On a slightly different train of thought, understanding that the issues in this case arose at trial snapshot in time. But administrations change. And can you tell me what the current policy is? Is it that this surgery would never be provided, would not be provided in any case, that it might be provided on an individualized basis, that it might be provided as elective surgery or, in your view, elective surgery if cost issues could be dealt with outside of taxpayer funding? Can you tell me what the current position is? The current Department of Corrections policy on the identification and treatment of gender identity disordered inmates does not have a blanket prohibition for a sex reassignment surgery. So each individual would be taken and examined by the mental health staff and the specialist and would make a decision looking at the patient's clinical makeup and needs as well as the security concerns. So, I mean, I can only speculate, but there would be an evaluation and they would also look at housing as well as safety and security concerns for that individual should it show up in the future. But what, I'm still trying to figure out, what is the missing component here in the Department's mind? And your medical professionals that you contract with said that she needs the surgery. Only an outside expert after your many medical experts have given you the same recommendation. I don't understand in a hypothetical future situation where, even though you're not arguing for a blanket prohibition, I can't conceive of an instance, and you're not helping me out here, as to when the Department would ever, if there's no blanket prohibition, would ever agree to provide the surgery. Well, I mean, it would have to come on a case-by-case basis. Individualized assessments of the individual would. There's individualized assessment of COSLIC which had recommended the surgery. That was done by the outside advisors to our medical services provider. And then we contacted a woman named, a specialist named Cynthia Osborne, who had worked in prison before. She gave a review of the Fenway Clinic report, raised a number of concerns. But shortly thereafter, we were asked by the court to make a decision, and the decision from Commissioner Dennehy was that there are significant security concerns that have to be addressed, and that would make it almost impossible for, in her mind, to have presented the surgery. Is it that she doesn't need it, or that you can't accommodate the security situation? It's that under the Eighth Amendment, we are required to provide minimally adequate treatment. And that treatment would be a treatment that is effective, and which has been effective in this case. Ms. Kosilek receives hormone therapy. She was with an endocrinologist monitoring it. Access to female clothing and canteen, access to electrolysis and hair removal, and psychotherapy. So we have been providing a significant amount of treatment directed towards Ms. Kosilek's disorder. And we also have treatment in the background. Should Ms. Kosilek become depressed or disordered at some point, or suicidal, then there are other treatments that would be put into place. Not in place of GID treatment, but in conjunction with, to address any suicidality or depression that may come up in the future based on Ms. Kosilek not receiving the desired sexual assignment surgery. And in fact, this is a surgery that's available to less than 5% of the gender dysphoric population, according to the testimony of Dr. Schmidt and Dr. Kaufman. Very few people receive this treatment in the community. What was the testimony of Dr. Schmidt as to the necessity of this treatment? Well he did not believe that it was medically necessary to have the sexual assignment surgery for any individual in the community. His perspective was that if you wanted to do it, and you were ready, he would open up the door for you. He would send the materials to your surgeon and say there are no counterindications. So his position was to let the patient make the entire decision, and if their system was that they wanted to go ahead with the surgery, he would do everything in his purview to assist that by providing all the information to the surgeon. Dr. Schmidt's role in this whole diagnosis is that he does an evaluation, and that's all that he does professionally in this realm. His testimony was that once he diagnoses the GID, he then refers the patient to a psychotherapist who provides a more detailed evaluation to determine the individualized needs of that particular patient. That seems pretty traditional in my understanding of various practices. But Dr. Schmidt doesn't do that detailed evaluation himself. His role was limited to just making a determination as to whether the patient had the disorder in the first place. Well I think he did more than diagnosis. In fact, he would write the letters. He would send his files to the surgeon. So it was more than just a passing off. He said that he stayed neutral because it was a patient decision. He stayed neutral. If you reread his transcript. But neutral in the decision of whether or not the patient should have it or not. He didn't say you must have the surgery because I think it's the only thing you can do. He said if you want the surgery, then you should go ahead and do it. In fact, Dr. Levine had a similar practice of opening the door for individuals they felt were appropriate and then letting the patient make the decision. But Dr. Schmidt never said that it was never needed. It was never medically needed. But certainly it was needed. Certainly there are people that he treated that did have the surgery. Thank you. Judge Lynch, have any questions? No. Thank you. I've lost the paper with the name. Good morning, Mr. Sullivan. Good morning, your honors. Joseph Sullivan for the appellate. Michelle Kozak. May it please the court. When the district court ordered the Department of Corrections to provide sex reassignment surgery for Michelle Kozak, it did not break any new legal grounds. Other courts in this circuit, as well as other circuits, have ordered particular types of for this particular condition. It's just that Ms. Kozak is the first inmate in the country to receive a recommendation for this treatment as medically necessary from the prison doctors. But the underlying legal principles here are not disputed, and I didn't hear any arguments on the actual legal issues, on the legal principles by my brother here. What I heard was arguments about the facts. What the department is asking this court to do is to reassess the facts that led the district court to find that Ms. Kozak had a serious medical need, and to reanalyze the expert opinion that led the district court to find that her minimally adequate care was surgery, and to re-evaluate the evidence that led the district court to find bad faith. And I submit that as an appellate court, that's not a role the district court should entertain. Let me ask you, am I correct in reading the record as stating that both your client and various doctors that have treated her indicate that the present regime has stabilized her condition? The present regime has been sufficient to alleviate her symptoms somewhat, but the treating clinicians as well as the experts have said she still suffers from a severity of mental anguish that cannot be treated without sex reassignment surgery. And Judge Wolf, the district court found that she still suffers a severity of mental anguish that by itself constitutes a serious medical need under the Eighth Amendment. It's clear in this court's precedent and other circuits that a psychological injury is a serious medical need under the Eighth Amendment. Now, threats of suicide are not uncommon in a prison setting, are they? No, they're not, Your Honor. And how are they usually treated? Well, they're usually treated as the clinicians or as the security people feel is appropriate to address that. Here, though, the experts were asked specifically if Ms. Kozlick was threatening suicide as a manipulative effort or as an honest manifestation of what she's going to feel. My question assumes the second part, that she's honest in her manifestations or her statements. But she has had this situation since she has been in prison for the last 20 years, has she not? Yes, Your Honor, but at the moment, sorry. Am I correct that during that period of time, there has been no such attempt or attempt to self-castration as she did before she was in prison? I believe in the House of Corrections, she did have a self-castration effort. But when she was in the Department of Corrections, she did not. However, it's undisputed that she's not suicidal. And in fact, under the standards of care, to be eligible for sex reassignment surgery, you can't be suicidal. You have to have a mental stability to understand what you're going towards. So it's a little bit of a paradox for the department to say, well, she's not suicidal now, so she doesn't need this care. Under the standards of care, she can't be suicidal to need this care. The treatment that Dr. Schmidt recommends for her suicidality is not meant to treat her serious medical need. As my brother said, Dr. Schmidt does not believe she has a serious medical need for gender identity disorder. And he understands that she's not suicidal right now. What he's recommending is treatment for if she becomes suicidal or depressed in the future. And in that case, we agree. If she becomes suicidal in the future, she should get antidepressants. She should get psychotherapy and hospitalization if necessary. But the question before the court was what her serious medical need was at the time of trial. And at that point, the treating clinicians, as well as the chief medical officer, So let me, your last response does raise a question for me. And I'd be very interested in you helping me to figure out whether this is a critical question, whether it's not a critical question. If it is a critical question, how do I deal with this? I think the cases are pretty uniform in saying that if there are differences of opinion among the professionals about what kind of treatment is adequate, is proper, then deference is owed. And if that's the case, and you have to have at least malpractice. The cases all seem to say you have to have more than malpractice in order for it to constitute deliberate indifference. What is it about Dr. Schmidt? I mean, we must be saying that in his regular practice, he's committing malpractice at a minimum. What am I missing here? Otherwise, the Department of Corrections, it would seem to me, is entitled to rely on his consultations, his advice, even if it is an outlier. Your Honor, the case law that discusses disputes among treatment is about the subjective problem. It's about whether or not the Department knew of the risk. And if a department doesn't know that what it's doing is inadequate, then there's no constitutional violation. But it's more than that, isn't it? You can know of the risk and still have treatment options. Right. That's where my question is going. Here, Your Honor, it's undisputed that it's the court's duty to determine constitutional rights. That duty can't be delegated to the prison. In this case, with the DOC's expert and the plaintiff's expert, they had differing views on the adequacy of care. And it's the constitutional right to minimally adequate care that's the question. That question is determined by the court. When there's a dispute of opinion about adequacy of care that is not due to a deliberate disregard, that does not create an infinite violation. Here, however, we have to remember there was an earlier decision, Coase Look 1. In that case, the district court did not find an infinite violation because it found that the department did not know that what it was doing was not adequate. How do you deal with our longstanding precedent, Lane versus Vincent? You're probably more familiar with the case than I am. But it says that courts generally do not second guess these disputes among treating physicians, professionals. I believe, again, that that case law is regarding the subjective prong. That's right, but that's what we're talking about. But no, what I'm saying here is, though, in this case, the department had a decision in 2002 that said the statements of care are the treatment protocols. The decision said sex reassignment surgery is medically necessary sometimes. They had a recommendation from their doctors in 2005 that sex reassignment surgery was minimally adequate. So by that time, by the time that this trial started, they had no other reasonable belief to find that she had any other minimally adequate care that could treat her needs other than sex reassignment surgery. They went out and found Dr. Schnitt. So find somebody. I don't mean to be flippant, but so what? Well, we're an appellate court. And I'm referring to our case law that says we do not get involved in those kinds of decisions where there is a dispute among the professionals. And I truly am not trying to be flippant. I want you to help me here. But, Your Honor, I believe if what you're suggesting would be correct, it would allow a prison system to simply decide it does not want to provide a treatment and then go out and select a doctor who agrees with that predisposed position. Right. That's not allowed under the Constitution. What's your case for that? The case is Batista, Farmer. All the cases that say the Eighth Amendment requires minimally adequate medical care. Minimally adequate medical care is a factual determination for the court to make. Whether or not there's a serious legal conclusion. You get the facts. You have, assuming they're properly sustained by the record, you accept the facts. But then the term you have just indicated is a legal term that has to be with that, the know by the appellate court. Your Honor, I agree that serious medical need is a legal term. My argument here is that a serious medical need is undisputed what it means here. A serious medical need is when a condition has been diagnosed as mandating treatment. That's in this circuit's precedent and other circuits precedent. Here, the district court found that Ms. Koestler had been diagnosed by the treating clinicians as well as other clinicians with a condition that required treatment under the law. Yes, required treatment. The question is whether the treatment that was given, which had improved his condition, is inadequate. And the doctors that the department used to evaluate her found that it was not. That was a factual determination for the court to determine. Whether or not, again, a serious medical need is defined. What that means under the law, we know. It means when a condition has been mandated as requiring treatment by qualified physicians. And here, there are qualified physicians who have recommended that Ms. Koestler requires this treatment. How would it work? Let's take an example. A prisoner is suffering acute, serious pain, and the prison goes to its own three doctors, and they all say, can be corrected with back surgery. Standard, here's how you do it. And they refuse to do it. And then they go to trial. And at trial, they find some fourth doctor somewhere that says, well, I think just giving more pain medication would have been enough. And the district court judge says, that's not prudent medical advice. How would you analyze that situation? I would analyze it based on the district court has to decide the objective prong, because it's an objective prong deciding whether or not what was adequate care. And it would assess the differing opinions among the doctors. But subjectively, it would see that when the prison system went out and looked for a doctor, it already had consistent recommendations for this particular care. So it can't claim ignorance. In the original trial, the department did not know that Ms. Koestler needed this care, did not know the standards of care with the treatment protocols. In this case, it did know that. In this case, it had consistent recommendations that she needed this treatment. The only information it had was that sex reassignment surgery was medically necessary sometimes, and that she required this treatment. Dr. Schmidt didn't seem to think that. And his testimony is discarded by the court, basically because he thought that the standards of care document was an advisory guideline rather than a mandatory one. Do you think it was mandatory? The standards of care, as most treatment guidelines, do not – they're not mandatory in themselves. But within the standards of care, there's a directive that says unequivocally, sex reassignment surgery is medically necessary in some patients. And every cert that has addressed this question – It's not a guideline, because the document indicates that all of the information in that document are guidelines. Now, that cert provision is very clear. It states that sex reassignment surgery is medically necessary. The guidelines fact is regarding that there can be deviations regarding how treatment is given. The fact – Page 2 of the guidelines says – and I'm reading somewhat out of context, and I'll, of course, give you the opportunity to show where I'm wrong, but it says the SOC are intended to be flexible. Next paragraph. As in all previous versions of the SOC, the criteria put forth in this document for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines, et cetera, et cetera. And it seems, from reading the district court opinion, that that was basically the reason why the court discarded Dr. Smith's testimony. Which is what the defendants relied on for their actions. Even that my brother agrees that a blanket prohibition on any particular treatment is not allowed, Dr. Smith's testimony, if accepted, would create a blanket prohibition on this particular care. And if this court reverses on the grounds that she does not need this care, with all the recommendations in this case – I don't think that's a fair characterization of what Brother Counsel said. I thought he said that – and correct me if I'm wrong – I thought he said that Dr. Smith's point was that at some point it might be left up to the patient. That doesn't mean it's a blanket prohibition, which is why I was asking what the department's policies were today. No, what I meant was I believe my brother – It just wouldn't be an Eighth Amendment violation. What I meant is I believe the department is not holding the position that it can blanketly prohibit this treatment. But Dr. Smith's opinion would result in that. If his treatment recommendations held the day, that would result in this. And if this court reversed on the grounds that Ms. Kozlik does not have a sufficient need for the surgery, with all the recommendations she has and no other contraindications other than Dr. Smith, there will never be a prisoner who has a need for this surgery. And this court would have created a blanket prohibition on this particular treatment. What about if the decision was that simply an Eighth Amendment violation had not been established? That's a little different than what you're saying. I believe with that – I think within that it depends on what the basis for that finding was. If the basis for that finding was that she did not have – she was receiving sufficiently adequate care, I believe that would create the blanket prohibition because of all the evidence that supports Ms. Kozlik's right to this care. Ms. Kozlik has treating clinicians. Let's be clear here. There's very rarely a case, and we're not aware of any other cases outside of the gender identity disorder context, where treating clinicians at a prison recommend treatment. And then the prison officials go out and deny that treatment, and then go out and hire their own doctors to find somewhere else. It's clear that Dr. Schnitt here does not believe that sex reassignment surgery is ever necessary. And that is contrary to the district court's opinion in the first Kozlik decision. It's contrary to all the other circuit opinions that have held that the standards of care are the treatment protocols for gender identity disorder. It's not just in this circuit. Other circuits have held that. The Seventh Circuit, in the Fields case recently, held that a blanket prohibition on hormones and sex reassignment surgery is unconstitutional. And that's because a prisoner's medical care must be determined on an individualized basis. For this prisoner, for her particular needs, she needs sex reassignment surgery. As my brother said, 5% of prisoners or people with this condition need that surgery. We have no problem. We agree with that. Let me interrupt you a second because I want to ask you about the security issue. Did you present any evidence to contradict the state's allegations? Excuse me, the allegations of? Regarding the security issues that they saw by proceeding as you were requesting. Well, we presented evidence in the form of, you know, cross-examination. And we had, for instance, Superintendent Bissonnette testify that in her prison, she has many inmates who are mothers and she has many inmates who are in there for murdering children. And she admits that those types of inmates cause trauma on each other. But her staff has the ability, with training and through their guidelines and rules, to deal with that trauma. And that, as both Commissioner Clark and Commissioner Denny said, post-operative transsexuals would be housed in general population generally at Framingham if they were arrested and there was no notoriety. As my brother said, it was primarily Ms. Kozak's notoriety that makes her a danger. It's not her fault that she's been denied this treatment so much. And her notoriety has nothing to do with her transgender status. There are many notorious prisons, prisoners, Department of Corrections houses all types of prisons. This is what they do. Well, when do you propose that she be housed after the operation? Well, both Commissioner Clark and Commissioner Denny have said that she could be housed safely in the segregated units. But there's certainly evidence that she could be housed safely in the general population of Framingham. But that's not our determination to make. This district court here was required to make as narrowly tailored an injunction as possible under the PLRA and the circuit precedent. This district court, remember, was not eager to intervene here. It had a trial in 2005 where it heard the testimony in Maine. Then it called back the witnesses to testify if their opinions had changed based on the trial testimony. Then it hired Dr. Levine. Then it called back the experts to testify about Dr. Levine's testimony. Then, without a request from the department, when Commissioner Clark came on, it asked Commissioner Clark to testify. Because Judge Wolf recognized that he's a new decision maker and his opinion might have been different. He asked Commissioner Clark to testify. Commissioner Clark said he would take a fresh look, but he didn't. He didn't know basic facts about Ms. Kozolat. Didn't know her age. She's 65 today. Didn't know her weight. Did not know that she had a basically spotless disciplinary record. Also did not consider the fact that, in his own experience as a commissioner at Washington State, he had taken a post-operative male-to-female transsexual from the state of New Hampshire in an interstate transfer so she could be housed more safely in Washington. And that prisoner was housed so safely in Washington that this Commissioner Clark forgot all about her until we asked him questions about it. Let's assume, for the purpose of argument, that the district court did not have to give deference to the government, the state's security concerns. Does that mean that there are no security concerns in this case? Because it's from bad faith, it meant it could evaluate the concerns through a regular inquiry. And there was plenty of evidence that there was bad, that there was, that there were no concerns. Or surmising evidence. There was the evidence that post-operative transsexuals are housed there. Evidence that there are regulations routinely that allow prisoners to be put from segregated units back into the general population. And the admission from the commissioners that she could be safely housed in a segregated unit. If that's not going to be, and if that had to be, that would have to be. And if that created an issue in the future, that's not for this court to assess. Just wrapping up, if this court reverses, I believe it's going to create a precedent that creates an exception under the Eighth Amendment for gender identity disorder. That would not be a good precedent to set. It would create a blanket prohibition on this treatment, and an exception under the Eighth Amendment that has never been created before for a particular medical care. Thank you. Thank you. Excuse me, counsel, before you step back. Yes. Judge Lynch may want to ask some questions. No, thank you, Judge Correa. Thank you. Thank you very much. I thank both parties for excellent argument and excellent briefing. And I'm sure they will be helpful to the court. And I thank you all on behalf of the court.